IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | | |
|---|---|---|
| WANDA H. ELLIS, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL NO. 3:12-cv-219-JAG |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Wanda H. Ellis ("Plaintiff") is 52 years old and has worked as a receptionist, teller and bookkeeper. She alleges that she suffers from back pain caused by congenital spinal canal stenosis and degenerative disc disease. Plaintiff protectively filed for Disability Insurance Benefits ("DIB") on October 31, 2008, with a disability onset date of July 23, 2007, under the Social Security Act ("the Act"). Plaintiff's claim was presented to an administrative law judge ("ALJ"), who denied Plaintiff's request for benefits. The Appeals Council subsequently denied Plaintiff's request for review on January 21, 2012.

Plaintiff now challenges the ALJ's denial of benefits, asserting that the ALJ improperly evaluated Plaintiff's credibility and should have assigned controlling weight to the opinions of Plaintiff's treating neurosurgeon. (Pl.'s Memo. in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") at 8, 25-26.) In her decision, the ALJ assessed Plaintiff's credibility based on Plaintiff's prescription drug use, medical records, activities of daily living ("ADLs"), conservative nature of treatment and inconsistent statements during the hearing. (R. at 15-19.) The ALJ also refused to assign controlling weight to Plaintiff's treating neurosurgeon's opinions, because they were

inconsistent with his treatment notes and appeared to be based on Plaintiff's subjective complaints. (R. at 18.)

Plaintiff seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). The parties have submitted cross-motions for summary judgment, which are now ripe for review.[1] Having reviewed the parties' submissions and the entire record in this case, the Court is now prepared to issue a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons discussed herein, it is the Court's recommendation that Plaintiff's motion for summary judgment (ECF No. 8) be DENIED; that Defendant's motion for summary judgment (ECF No. 12) be GRANTED; and that the final decision of the Commissioner be AFFIRMED.

# I. BACKGROUND

Because Plaintiff complains that the ALJ erred when she assessed Plaintiff's credibility and did not assign controlling weight to the opinions of Plaintiff's treating neurosurgeon, Plaintiff's physical ailments are relevant to the present case. As such, Plaintiff's education and work history, Plaintiff's medical history, the opinions of Plaintiff's treating neurosurgeon, other treating physicians and the non-treating state agency physicians, and Plaintiff's statements are summarized below.

## A. Plaintiff's Education and Work History

Plaintiff has a high school education and completed two years of college. (R. at 28, 40.) She previously worked as a receptionist, teller and bookkeeper. (R. at 28-29, 41-44.) At the time

---

[1] The administrative record in this case has been filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

that she was injured, Plaintiff worked at GetLoaded.Com as a receptionist. (R. at 28, 41.) She was 48 years old at the time of her alleged disability onset. (R. at 80-81.)

**B.    Plaintiff's Medical Records**

Plaintiff injured her back at work picking up a box on July 23, 2007. (R. at 258.) Two days later, Plaintiff visited her primary care physician, Robert E. Mayfield, M.D., who diagnosed Plaintiff with a low back strain with radicular pain. (R. at 156.) On a Worker's Compensation evaluation form, Dr. Mayfield noted that an x-ray revealed no gross abnormalities and that Plaintiff had a limited range of motion, but her reflexes, strength and bulk were normal and she had no bony tenderness. (R. at 156.) Dr. Mayfield prescribed Lortab, wrote an "excused from work" note for July 23 through July 27, and released her to return to her regular work on July 30, 2007. (R. at 156.)

At a follow-up appointment on August 6, 2007, Dr. Mayfield documented that Plaintiff's pain had increased since her last visit. (R. at 310.) He prescribed Percocet and referred Plaintiff to physical therapy. (R. at 310.) At that time, Dr. Mayfield noted that Plaintiff's return to work date was pending, but that she had an MRI scheduled for August 10. (R. at 310.) The MRI exam revealed evidence of spinal canal stenosis and minimal degenerative changes. (R. at 238.) Plaintiff had a follow-up examination with Dr. Mayfield on August 16, 2007, to discuss the results of the MRI. (R. at 308.) Plaintiff was "doing ok" and her medications were providing mild relief. (R. at 308.) Dr. Mayfield added a prescription for Celebrex and continued her prescription for Percocet, although he cautioned her to use it "sparingly." (R. at 308.) Dr. Mayfield also referred Plaintiff to David S. Geckle, M.D., a neurosurgeon. (*See* R. at 258.)

Plaintiff's first appointment with Dr. Geckle was on August 20, 2007. (R. at 258-59.) Dr. Geckle noted that Plaintiff had mild tenderness in her lower back, but overall had good

3

strength as well as normal muscle tone and bulk. (R. at 259.) Dr. Geckle noted that Plaintiff's

MRI revealed "mild canal stenosis" and no disc degeneration. (R. at 259.) Although Dr. Geckle

felt that surgery was not in Plaintiff's best interest at the time, he recommended epidural

injections and discussed an exercise plan. (R. at 259.) Dr. Geckle referred Plaintiff to Peter

Duke Crane, M.D., a pain management specialist, for further evaluation. (R. at 259.)

On August 28, 2007, Plaintiff had her initial appointment with Dr. Crane. (R. at 281-83.)

Dr. Crane noted that Plaintiff had mild tenderness in her lower back, but her straight leg tests

were negative and her muscle power, tone and bulk were normal. (R. at 283.) Plaintiff could

stand from a seated position without difficulty and could normally walk on her heels and toes.

(R. at 283.) Dr. Crane agreed with Dr. Geckle's recommendation for the epidural injections. (R.

at 283.)

While Plaintiff waited for insurance authorization for the epidural injections, she attended

physical therapy. (*See* R. at 534.) The physical therapist recommended that Plaintiff would

benefit from continued physical therapy, despite Plaintiff's complaints that the pain was

becoming worse. (R. at 534.) She also advised that Plaintiff should be able to return to work,

although limited to light duty with no lifting. (R. at 534.)

Plaintiff had two appointments with Dr. Geckle while awaiting approval for the

injections. (R. at 652-53.) On November 28, 2007, Dr. Geckle noted that Plaintiff continued to

have pain but it was "no more severe than what it had been." (R. at 653.) He also found that she

had good strength, normal muscle tone and bulk, as well as a normal and steady gait. (R. at 653.)

He noted the same findings on January 2, 2008, although he continued to keep Plaintiff out of

work, pending the epidural injections. (R. at 652.)

4

While waiting for the insurance approval for the epidural injections, Plaintiff visited Dr. Mayfield seeking narcotic pain medications six times. (R. at 241-47.) On September 26, 2007, Dr. Mayfield lowered Plaintiff's Percocet dosage. (R. at 413.) The next day, Plaintiff argued with the pharmacist that this lower dosage was incorrect. (R. at 413.) She was advised that Dr. Mayfield intentionally lowered the dosage, but he noted at her next office visit — October 9, 2007 — that she was not tolerating the lower dose. (R. at 241, 413.) He modified her prescription to the higher Percocet dosage and added Duragesic and Lidoderm patches. (R. at 241.) Dr. Mayfield continued to prescribe narcotic pain medications in varying combinations and dosages through April 2008 when the insurance approved the epidural injections. (R. at 242-247.) He opined on April 8, 2008, that Plaintiff may need to limit her periods of extended sitting, but deferred to a specialist on work restrictions and capability. (R. at 247.)

Plaintiff underwent her first epidural steroid injection on April 1, 2008. (R. at 665-66.) At that time, Dr. Crane documented negative straight leg raises, 5/5 strength and normal muscle bulk and tone. (R. at 663.) On April 23, 2008, Dr. Geckle noted that the injection had eliminated 20-25% of Plaintiff's pain. (R. at 256.) Her physical exam again revealed good strength, normal muscle tone and bulk and a normal gait. (R. at 256.)

Plaintiff received one more injection on May 19, 2008. (R. at 672-73.) On June 3, 2008, Dr. Crane determined that the injections were not helping Plaintiff and discontinued the treatment. (R. at 674.) At that time he offered to begin monitoring her pain medications, which included Duragesic, Oxycodone, and Cymbalta, but Plaintiff declined his offer. (*See* R. at 248, 674-75.)

After the injections were discontinued, Dr. Geckle advised Plaintiff that she had two options: surgery or a Functional Capacity Evaluation ("FCE") and continuing with medication.

(R. at 248.) An FCE was scheduled for July 24, 2008. (R. at 248.) The FCE indicated that Plaintiff demonstrated the capacity to perform work consistent with a medium level of physical demand and that her work was limited to occasional lifting due to pain and fatigue. (R. at 285.) Dr. Geckle agreed with the assessment by endorsing the FCE report. (*See* R. at 285.) At Plaintiff's next follow-up appointment on August 27, 2008, Dr. Geckle noted that the FCE results were "acceptable and appropriate in regard to her present level of functioning" and that the "restrictions outlined in the FCE report are acceptable in regard to guiding what work she should be capable" of performing. (R. at 633.)

On September 18, 2008, Plaintiff saw Dr. Mayfield. (R. at 604.) Dr. Mayfield noted his approval of the work restrictions recommended in the FCE and by Dr. Geckle. (R. at 604.) He modified Plaintiff's pain medications by lowering the dosage of the Duragesic with the ultimate intent to discontinue its use, lowering the Percocet dosage and adding Oxycontin. (R. at 604.)

Plaintiff was examined on November 18, 2008, by E. Claiborne Irby, Jr., M.D., an independent orthopedic specialist. (R. at 260-62.) Dr. Irby indicated that he believed Plaintiff's spinal stenosis "certainly could contribute some" to her pain. (R. at 261.) His physical examination of Plaintiff was "unremarkable for any objective findings," although he did note some subjective tenderness and limited function. (R. at 261.) Plaintiff was able to get on and off the table and walk around the room without any obvious discomfort. (R. at 260.) Although her examination was negative and, although he did not believe that surgery or more physical therapy would benefit Plaintiff, Dr. Irby opined that interventional pain management was unnecessary and that Plaintiff should be weaned off her pain medications. (R. at 261-62.) Dr. Irby also reviewed the FCE results, opining that Plaintiff could perform the duties of a data entry representative on a full-time basis. (R. at 261.)

6

Plaintiff saw Drs. Geckle and Mayfield shortly after her examination by Dr. Irby. (R. at 603, 648.) During her appointment on November 19, 2008, Dr. Geckle noted that Plaintiff's pain was "no worse than what it was before" and that her pain management was reasonable. (R. at 648.) Plaintiff saw Dr. Mayfield on November 21, 2008. (R. at 603.) She told Dr. Mayfield that Dr. Irby had questioned her about only being prescribed Oxycontin. (R. at 603.) Because Plaintiff complained of breakthrough pain, Dr. Mayfield increased her Oxycontin dosage. (R. at 603.)

On December 31, 2008, Plaintiff visited Dr. Crane. (R. at 676-77.) Dr. Crane noted that Dr. Mayfield had attempted to wean Plaintiff off of the pain medications, but that she had not tolerated it well. (R. at 676.) Dr. Crane reviewed the FCE and recommended to Plaintiff that they follow the limitations recommended in that report. (R. at 677.) At Plaintiff's request, Dr. Crane assumed management of her medication regimen, executing a pain management agreement. (R. at 677.) Although he discussed a future need to consider narcotic rotations and holidays, he increased Plaintiff's Oxycontin dosage. (R. at 677.) Dr. Crane also instructed her to follow-up with Dr. Geckle about surgical options. (R. at 677.)

Dr. Geckle wrote a "return to work" note on February 20, 2009. (R. at 692.) He opined that Plaintiff could return to light work duties as of September 24, 2008, but was restricted to only four hours per day, three days per week. (R. at 692.)

Plaintiff returned to Dr. Mayfield on March 13, 2009, for a prescription refill and complained of a sore throat and cough. (R. at 600.) Dr. Mayfield noted that Plaintiff's back pain was controlled. (R. at 600.) Although Dr. Crane was managing her pain medications, Dr. Mayfield prescribed Oxycontin. (R. at 600.) Plaintiff also followed-up with Dr. Geckle on March 25, 2009. (R. at 693.) He noted that while her gait was "mildly antalgic," she could stand

on her toes and heels and her condition was "stable without evidence of deterioration." (R. at 693.) Plaintiff refused surgery. (R. at 693.)

On March 30, 2009, Plaintiff followed-up with Dr. Crane. (R. at 678.) Plaintiff reported little benefit from the increased pain medication. (R. at 678.) Dr. Crane continued Plaintiff's prescriptions for Oxycontin and Cymbalta and added a trial of Flexeril, a muscle relaxer. (R. at 678.) Plaintiff visited with Dr. Crane again on June 30, 2009. (R. at 680.) At that point, Plaintiff was "satisfied with her level of analgesia" and deferred any medication changes. (R. at 680.)

At an appointment for her back pain with Dr. Mayfield in August 2009, Plaintiff told him that she was not sleeping well due to pain. (R. at 685.) Dr. Mayfield prescribed a trial of Lyrica, a pain medication. (R. at 685.) He directed her to call the following week if the medication was helping to titrate the dosage. (R. at 685.)

Dr. Geckle noted a "mild deterioration, at least symptomatically" on September 30, 2009. (R. at 694.) He documented that Plaintiff's gait was "somewhat antalgic" and Plaintiff reported that her pain was slightly worse. (R. at 694.) Plaintiff again refused surgery. (R. at 694.) In March 2010, Dr. Geckle noted normal findings from Plaintiff's physical exam, but her gait was "minimally antalgic." (R. at 698.) He did not see "any evidence of significant deterioration of function." (R. at 698.)

Dr. Crane continued to manage Plaintiff's pain medications. (*See* R. at 701-18.) He administered an epidural steroid injection on January 14, 2010. (R. at 715-16.) Plaintiff complained that she was not receiving adequate relief from her pain and, on February 12, 2010, Dr. Crane added Neurontin to her medications. (R. at 710.) Plaintiff reported that she was "feeling a lot better" and had increased her ADLs. (R. at 706.) In May 2010, Dr. Crane noted

that Plaintiff had no adverse side effects from her medications. (R. at 701.) Although Plaintiff reported numbness and weakness in her leg, her only complaint of pain was in her right toe. (R. at 701.)

## C.  The Opinions of David S. Geckle, M.D., Plaintiff's Treating Neurosurgeon

On three occasions before August 9, 2010, Dr. Geckle opined that Plaintiff was "totally incapacitated" for a specified time period. (*See* R. at 466, 517, 657.) On August 21, 2007, Dr. Geckle opined that Plaintiff was incapacitated from August 20, 2007 through September 10, 2007. (R. at 657.) On January 18, 2008, he opined that Plaintiff was incapacitated from January 21, 2008 through March 31, 2008. (R. at 466.) Finally, on June 18, 2008, Dr. Geckle opined that Plaintiff was incapacitated through September 30, 2008. (R. at 517.) Dr. Geckle did not provide a basis for any of these opinions. (*See* R. at 466, 517, 657.)

On August 27, 2008, Dr. Geckle reviewed the FCE examination conducted on July 24, 2008, and opined that the restrictions in the FCE were "acceptable in regard to guiding what work she should be capable" of performing. (R. at 633.) On February 20, 2009, however, Dr. Geckle modified that opinion. (*See* R. at 692.) He released Plaintiff back to light work as of September 24, 2008, but restricted her to four hours per day, three days per week. (R. at 692.) Dr. Geckle did not provide a basis at that time for the change in his opinion. (R. at 692.)

On August 9, 2010, Dr. Geckle opined that Plaintiff had been incapable of full-time work since the time of her injury in July 2007. (R. at 750.) He based this opinion on the effects that he believed an eight-hour work day would have on Plaintiff's pain. (R. at 748-49.) He noted that the limitations from February 2009 were intended to give Plaintiff time to recover from any pain caused by work activities. (R. at 749.) Dr. Geckle opined that if Plaintiff were to work, she would require "significant work accommodations." (R. at 749.) He also listed Plaintiff's pain

9

medications, which could affect her ability to focus, as a basis for his opinion that Plaintiff was unable to perform any full-time work. (R. at 750.)

## D.    The Opinions of Plaintiff's Other Treating Physicians

On July 25, 2007, Plaintiff's primary care physician and treating physician, Dr. Mayfield, completed an initial evaluation for Worker's Compensation. (R. at 611.) At that time, he diagnosed a low back strain with radicular pain. (R. at 611.) Dr. Mayfield wrote Plaintiff a work excuse note for July 23 through July 27 and restricted her from repetitive bending, stooping or lifting. (R. at 611.) He listed her return to regular work date as July 30, 2007. (R. at 611.) On April 8, 2008, Dr. Mayfield opined that periods of extended sitting may need to be limited for Plaintiff, but deferred that determination to a specialist. (R. at 606.) On September 18, 2008, Dr. Mayfield noted his approval of the work restrictions of the FCE and by Dr. Geckle. (R. at 604.) Dr. Crane, Plaintiff's treating pain management specialist, also reviewed the FCE on December 31, 2008, and recommended that Plaintiff followed the limitations that it outlined. (R. at 677.)

On November 18, 2008, Plaintiff underwent an examination by Dr. Irby, an independent medical examiner. (R. at 260-62.) He opined that Plaintiff suffered a lumbar strain in July 2007, which resulted in some right sciatica. (R. at 261.) Dr. Irby also opined that Plaintiff's spinal stenosis could contribute "some" to her symptoms. (R. at 261.) He believed that she could perform the duties of a data entry representative, as outlined to him, on a full-time basis. (R. at 261.)

## E.    The Opinions of Non-Treating, State Agency Physicians

On May 28, 2009, David Williams, M.D., a non-treating, state agency physician, reviewed Plaintiff's medical records. (R. at 80-90.) He opined that Plaintiff's medically determinable impairments included disorders of the back and unspecified arthropathies. (R. at

84.) Dr. Williams found that Plaintiff was partially credible, based on her ADLs, medication

treatment, treatment other than medication and precipitating and aggravating factors. (R. at 85.)

He indicated that she should be able to perform light work. (R. at 84.) Dr. Williams opined that

Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk for a total of

six hours in an eight-hour workday, sit for a total of six hours in an eight-hour workday,

frequently balance and occasionally stoop, kneel, crouch, crawl and climb ramps, stairs, ladders,

ropes or scaffolds. (R. at 86-87.) Plaintiff was not limited in pushing or pulling and had no

manipulative, visual, communicative or environmental limitations. (R. at 86-88.) On November

16, 2009, J. Astruc, M.D., a non-treating, state agency physician, affirmed Dr. Williams'

opinion. (*See* R. at 97-101.)

**F.      Plaintiff's Statements**

Plaintiff filed a Disability Report on November 21, 2008. (R. at 177-84.) Plaintiff listed

Cymbalta and Oxycodone as her medications with no side effects. (R. at 182.) On August 8,

2009, Plaintiff filed an Appeal Disability Report. (R. at 206-12.) Her medications were updated

to include Tizanidine. (R. at 209.) She listed nausea, constipation, sweat and occasional blurred

vision as side effects from the Cymbalta; nausea, vomiting, itching, lightheadedness, sweating,

fatigue, weakness and constipation as side effects from the Oxycontin; and dry mouth, fatigue,

weakness and constipation as side effects from the Tizanidine. (R. at 209.) She was not able to

sit or walk for long periods of time, walked with a limp, and could not stand on concrete due to

the pain. (R. at 210.)

On April 21, 2009, Plaintiff completed a Pain Questionnaire. (R. at 195-96.) She

described her pain as constant stabbing pain in her right lower back and leg. (R. at 195.)

Plaintiff was unable to sit or stand for long periods of time and her husband and daughter had to

help straighten up. (R. at 196.) Plaintiff indicated that her pain would wake her from her sleep. (R. at 195.) Walking, sitting, bending or stooping made the pain worse. (R. at 195.) Plaintiff wrote that she was taking Oxycontin, Cyclobenzoprine and Cymbalta for her pain, which helped "very little" and listed a variety of side effects from her medication, including nausea, vomiting, itching, lightheadedness, weakness, dizziness upon standing, blurry vision, drowsiness, sweating as well as headaches. (R. at 196.) Plaintiff also noted that Dr. Crane added the Cyclobenzoprine at her visit on March 30, 2009, but that she was still having some constant pain with the increased medication. (R. at 196.)

Plaintiff completed a Function Report on April 21, 2009. (R. at 198-205.) She noted that she lived with her family in a house. (R. at 198.) Plaintiff wrote that she typically drifted in and out of sleep, watched television and took a shower every day. (R. at 198.) Plaintiff was not responsible for taking care of anyone or any pets. (R. at 199.) She woke up every morning with pain in her right lower back and leg. (R. at 199.) Her husband helped her dress if she needed to bend. (R. at 199.) Plaintiff was unable to take a tub bath and needed her daughter's help to shave her legs. (R. at 199.) Her husband and daughter performed the housework, such as vacuuming and cleaning. (R. at 199.) Plaintiff did not need any reminders to take care of herself or to take medication. (R. at 200.)

Plaintiff indicated that she was able to prepare her own meals about once a week. (R. at 200.) She cooked a "whole lot less" after the injury due to pain from bending, stooping or reaching while cooking. (R. at 200.) The meals that she cooked took about 30 minutes to prepare and were typically "something ready to eat" such as sandwiches or yogurt. (R. at 200.) Plaintiff spent 20 to 30 minutes per week folding the laundry, but needed encouragement to do so on the bed or sofa. (R. at 200.) Her husband was responsible for loading and unloading the

laundry, performing household repairs and mowing the lawn. (R. at 200.) Plaintiff was unable to assist in the housework, because of the pain associated with bending, stooping and reaching. (R. at 201.)

Plaintiff went outside a "couple times" each week, traveling by riding in a car. (R. at 201.) She marked that she could go out alone and could drive, but did not drive much because of the pain. (R. at 201.) When she left the house, Plaintiff would go grocery shopping with her husband once or twice a week for a couple hours. (R. at 201.) Plaintiff's hobbies included reading and watching television. (R. at 202.) She marked that she did not spend time with others in person, on the phone or on the computer. (R. at 202.) If she did go out, Plaintiff marked that she needed someone to accompany her. (R. at 202.) She felt that her life was limited from her pain. (R. at 203.) Plaintiff was able to manage money without assistance. (R. at 201.)

Plaintiff marked that lifting, squatting, bending, standing, reaching, walking, sitting and kneeling made her pain worse. (R. at 203.) She could lift "very little" and could walk for about 20 to 30 minutes before she needed to stop and rest. (R. at 203.) Plaintiff could pay attention for "as long as needed" and could follow written and spoken instructions. (R. at 203.) She always got along well with authority figures and could handle stress and changes in routine. (R. at 204.)

On January 31, 2010, Plaintiff completed a Daily Activities Questionnaire. (R. at 224-28.) She was married and lived at home with her husband and daughter. (R. at 224.) She would fold clothes a couple times a week, dust the tops of furniture every two weeks and would put dishes in the dishwasher. (R. at 224.) Plaintiff went grocery shopping with her family every couple weeks and went shopping with family or friends. (R. at 224.) She went to a movie around Christmas the previous year, but was unable to sit through the entire movie due to pain in

her back. (R. at 224.) Plaintiff had to sit down and rest often before continuing with these activities. (R. at 224.)

Plaintiff listened to the radio a couple of hours per day and watched television four to five hours, although she might not watch the program that was on. (R. at 225.) She also played cards approximately once each month. (R. at 225.) Family would visit a couple times a week, while friends would visit once per week. (R. at 226.) Plaintiff went out and visited family every couple of weeks. (R. 226.) During these visits, Plaintiff would eat and shop. (R. at 226.) Plaintiff drove less than 200 miles each month, typically to doctors' appointments. (R. at 226.)

Plaintiff indicated that she was able to cook dinner for herself a couple times a week. (R. at 225.) She could use the crockpot to make dinner or the microwave for frozen dinners. (R. at 225.) Plaintiff needed assistance with shaving her legs and could no longer take tub baths due to her pain. (R. at 225.) She slept for only three to five hours per night because of her back pain. (R. at 227.) She would also take naps during the day. (R. at 227.)

Plaintiff testified before the ALJ on August 11, 2010, indicating that because of the pain she got stressed very easily and had a hard time focusing on tasks. (R. at 33-67.) She described her pain as a "burning sensation" and stabbing in her lower right back that continued down her right leg into her foot. (R. at 46.) Plaintiff also described spasms in her neck when turning, particularly looking to the left. (R. at 46, 56.) She rated her pain at eight out of ten without medication, falling only to a six while medicated. (R. at 47.) Her medicine — Cymbalta, Oxycontin and Gabapentin — caused her to have headaches, a little nausea and affected her ability to focus. (R. at 48.) Plaintiff spent at least four hours daily lying in bed. (R. at 48.) Sitting, bending and walking, particularly on concrete, aggravated her pain. (R. at 49.) Plaintiff could sit comfortably for up to an hour on a good day and stand for 45 minutes. (R. at 64.) She

14

could walk a block and a half or two blocks before stopping. (R. at 65.) Plaintiff could comfortably lift 10 to 15 pounds. (R. at 65.)

Plaintiff testified that she was able to dress herself every day and cooked dinner twice a week. (R. at 50-51.) She would usually make a roast in the crockpot. (R. at 51.) Plaintiff could not wash the dishes or load the dishwasher because of her pain. (R. at 51.) She testified that she could fold the laundry, but her husband washed and put it away. (R. at 51.) Plaintiff could not sweep, mop, vacuum, take out the trash or perform any yard work. (R. at 52.) She testified that she would make the bed. (R. at 52.) Although she might skim a newspaper, Plaintiff was unable to read, because she could not focus. (R. at 53-54.) She would watch about two or three hours of television each day. (R. at 54-55.)

Plaintiff stated that she would drive twice in an average week, although she was in pain while doing so. (R. at 52-53.) She went to the mall three times with her daughter over the summer. (R. at 54.) Plaintiff tried to walk for exercise, but had to stop because of the heat and the pain in her back. (R. at 55.) A walk around the block would take over an hour. (R. at 55.) Plaintiff would visit with friends once or twice a week for about an hour. (R. at 58.) She went three or four times during the summer to the flea market to visit with her husband. (R. at 59.) Plaintiff grocery shopped with her husband and daughter once a week or once every week and a half. (R. at 59.)

Plaintiff, her husband and daughter also visited a lake five or six times during the summer. (R. at 57.) Her husband would stop during the 45-minute drive to allow Plaintiff to stretch. (R. at 57-58.) Once at the lake, Plaintiff would sit in the trailer or visit with people, including her granddaughter. (R. at 58, 63.)

Plaintiff testified that she would have good days and bad days. (R. at 60, 61, 66.) On a good day, Plaintiff would watch television, fold clothes, dust furniture and cook dinner. (R. at 60.) In an average week, Plaintiff indicated that she would have two good days. (R. at 60.) On a bad day, Plaintiff would stay in bed all day due to the pain. (R. at 60.) She would have two or three bad days in an average week. (R. at 60.) When questioned by her counsel, Plaintiff answered that she would have three good days and four bad days, when considering a seven-day week. (R. at 61.) Toward the end of her testimony, Plaintiff stated that she was experiencing an "in-between" day. (R. at 66.) When the ALJ asked her how many in-between days she had per week, Plaintiff answered that she had two. (R. at 66.) After the ALJ noted her answer totaled nine days, Plaintiff stated that she had three bad days, two in-between days and two good days for a total of seven days in a week. (R. at 66.)

## II. PROCEDURAL HISTORY

Plaintiff protectively filed for DIB on October 31, 2008, claiming disability due to congenital spinal canal stenosis and degenerative disc disease with an alleged onset date of July 23, 2007. (R. at 174, 178.) The Social Security Administration ("SSA") denied Plaintiff's claims initially and on reconsideration.[2] (R. at 105-09, 111-13.) On August 11, 2010, accompanied by counsel, Plaintiff testified before an ALJ. (R. at 39-66.) On August 23, 2010, the ALJ denied Plaintiff's application, finding that she was not disabled under the Act. (R. at 8-21.) The Appeals Council subsequently denied Plaintiff's request for review, making the ALJ's

---

[2] Initial and reconsideration reviews in Virginia are performed by an agency of the state government — the Disability Determination Services ("DDS"), a division of the Virginia Department of Rehabilitative Services — under arrangement with the SSA. 20 C.F.R. Part 404, Subpart Q; see also § 404.1503. Hearings before administrative law judges and subsequent proceedings are conducted by personnel of the federal SSA.

decision the final decision of the Commissioner subject to judicial review by this Court. (*See* R. at 1-3.)

### III. QUESTIONS PRESENTED

Is the Commissioner's evaluation of Plaintiff's credibility supported by substantial evidence on the record and the application of the correct legal standard?

Is the Commissioner's evaluation of the opinions of Plaintiff's treating neurosurgeon supported by substantial evidence on the record and the application of the correct legal standard?

### IV. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record and whether the proper legal standards were applied in evaluating the evidence. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). Substantial evidence is more than a scintilla, less than a preponderance, and is the kind of relevant evidence a reasonable mind could accept as adequate to support a conclusion. *Id.* (citations omitted); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

To determine whether substantial evidence exists, the Court is required to examine the record as a whole, but it may not "'undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ].'" *Hancock*, 667 F.3d at 472 (citations omitted) (international quotation marks omitted); *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig*, 76 F.3d at 589). In considering the decision of the Commissioner based on the record as a whole, the Court must "'take into account whatever in the record fairly detracts from its weight.'" *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting

*Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951) (internal quotation marks omitted)). The Commissioner's findings as to any fact — if the findings are supported by substantial evidence — are conclusive and must be affirmed regardless of whether the reviewing court disagrees with such findings. *Hancock*, 667 F.3d at 476 (citation omitted). While the standard is high, if the ALJ's determination is not supported by substantial evidence on the record or if the ALJ has made an error of law, the Court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine if a claimant is eligible for benefits. 20 C.F.R. §§ 416.920, 404.1520; *Mastro*, 270 F.3d at 177. The analysis is conducted for the Commissioner by the ALJ, and it is that process that a court must examine on appeal to determine whether the correct legal standards were applied, and whether the resulting decision of the Commissioner is supported by substantial evidence on the record. *See Mastro*, 270 F.3d at 176-77.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity" ("SGA").[3] 20 C.F.R. §§ 416.920(b), 404.1520(b). If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition. *Id.* If the claimant establishes that she did not engage in SGA, the second step of the analysis requires her to prove that she has "a severe impairment . . . or combination of

---

[3] SGA is work that is both substantial and gainful as defined by the Agency in the C.F.R. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like, are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c).

impairments which significantly limit[s] [her] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c); *see also* 20 C.F.R. § 404.1520(c). To qualify as a severe impairment that entitles one to benefits under the Act, it must cause more than a minimal effect on one's ability to function. 20 C.F.R. § 404.1520(c).

At the third step, if the claimant has an impairment that meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (listing of impairments) and lasts, or is expected to last, for twelve months or result in death, it constitutes a qualifying impairment and the analysis ends. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the impairment does not meet or equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ is required to determine whether the claimant can return to her past relevant work[4] based on an assessment of the claimant's residual functional capacity ("RFC")[5] and the "physical and mental demands of work [the claimant] has done in the past." 20 C.F.R. §§ 416.920(e), 404.1520(e). If such work can be performed, then benefits will not be awarded. *Id.* The burden of proof remains with the claimant through step four of the analysis, such that she must prove that her limitations preclude her from past relevant work. *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987); *Hancock,* 667 F.3d at 472 (citation omitted).

---

[4] Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 416.965(a), 404.1565(a).

[5] RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR-96-8p. When assessing the RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. *Id.* (footnote omitted).

However, if the claimant cannot perform her past work, the burden then shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience, and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 416.920(f), 404.1520(f); *Hancock*, 667 F.3d at 472; *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000) (citing *Yuckert*, 482 U.S. at 146, n.5 (1987)). The Commissioner can carry his burden in the final step with the testimony of a vocational expert ("VE"). When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents *all* of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.* If the ALJ finds that the claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits. 20 C.F.R. §§ 416.920(f)(1), 404.1520(f)(1).

## V. ANALYSIS

The ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since July 23, 2007, and was insured through December 31, 2011. (R. at 13.) At step two, the ALJ determined that Plaintiff was severely impaired from spinal canal stenosis and degenerative disc disease of the lumber spine. (R. at 13.) The ALJ concluded at step three that Plaintiff's impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 14.) The ALJ then determined that Plaintiff had the RFC to perform light work, but with some limitations. (R. at 14.) The work must "afford[] a sit/stand option at will; require[] no more than occasional (up to 1/3 of workday) turning of the head from

20

side to side; and require[] only simple, repetitive work with an SVP of no more than 2." (R. at 14.)

The ALJ summarized Plaintiff's statements, which included complaints of constant pain in her lower back radiating into her right leg and foot. (R. at 15.) Plaintiff asserted that she was stressed easily, could not concentrate due to the pain and needed to lie down during the day. (R. at 15.) Plaintiff testified that she experienced headaches, nausea and an inability to focus due to her medications. (R. at 15.)

The ALJ noted that since July 2007, Plaintiff's medications included Percocet, Duragesic, Oxycontin and Neurontin, among others. (R. at 15.) When her primary care physician, Dr. Mayfield, attempted to wean Plaintiff off pain medications, Plaintiff asked her pain specialist to monitor her medications instead. (R. at 15.) Plaintiff opted to forego surgery. (R. at 16.)

Plaintiff was able to grocery shop, visit friends, watch television, cook, drive, visit the flea market with her husband and travel to the lake in a camper with her husband. (R. at 15.) Although Plaintiff testified that she had side effects from her medication, she reported no side effects to her treating physicians. (R. at 15.) Plaintiff also testified during the hearing about good days and bad days, first stating that she had only two good days a week, leaving five bad days, before later stating that she had three bad days per week. (R. at 15.) The ALJ assessed that Plaintiff's prescription drug use, medical records, ADLs, conservative nature of treatment, and inconsistent statements during the hearing diminished her credibility. (R. at 16.)

The ALJ next summarized Plaintiff's medical records. Plaintiff injured her back at work in July 2007, leading to a diagnosis by her primary care physician, Dr. Mayfield, in August 2007 of spinal canal stenosis at L4-5 with narrowing of the neural canal, peripheral canal stenosis and degenerative changes at L5-S1. (R. at 16.) Plaintiff underwent physical therapy. (R. at 16.) In

September 2007, the physical therapist indicated that she could return to light work with lifting restrictions, although Dr. Geckle, her treating neurosurgeon, did not release her back to work at that time. (R. at 16.) Plaintiff was referred to a pain specialist, Dr. Crane, who recommended epidural injections and nerve blocks to treat the pain. (R. at 16.) Plaintiff's physical examinations during this time period showed a negative straight leg raise, an ability to stand from a sitting position without difficulty and muscle strength of 5/5. (R. at 16.)

Plaintiff had an FCE in July 2008. (R. at 16.) The evaluation indicated that Plaintiff could perform medium exertional work, including lifting up to 29 pounds occasionally with no sitting restrictions. (R. at 16.) Dr. Geckle reviewed the evaluation in August and November 2008 and indicated that these restrictions were appropriate. (R. at 16.) Dr. Crane also agreed with the FCE during Plaintiff's next visit. (R. at 16.)

Plaintiff continued with follow-up visits with Dr. Geckle between July 2008 and March 2010. (R. at 12.) The ALJ noted that patient notes documented that Plaintiff was "stable without any signs of deterioration, had an essentially normal gait and her pain was reasonably managed with medication." (R. at 17.) In February 2009, Dr. Geckle submitted a work release indicating that Plaintiff was restricted to part-time work beginning in September 2008. (R. at 17.) The ALJ disregarded this release as unreliable, because she could not ascertain a reason for Dr. Geckle to issue it six months after the fact. (R. at 17.)

The ALJ assigned Dr. Mayfield's opinions appropriate weight, but found that the restrictions on bending, stooping and lifting were inconsistent with the medical evidence in the record. (R. at 18.) The ALJ considered the opinion of the physical therapist, although not a medical opinion, and gave the opinion appropriate weight. (R. at 18.) The lifting restrictions, however, were given little weight, because they were inconsistent with the medical evidence. (R.

at 18.) The ALJ gave Dr. Geckle's opinions little weight, because they were inconsistent with his own treatment notes and appeared to be based primarily on Plaintiff's subjective complaints. (R. at 18.) The ALJ noted that Dr. Geckle's opinion that Plaintiff was incapacitated for two separate time periods was inconsistent with his treatment notes, which indicated that Plaintiff's neurological exams were essentially normal and her pain was reasonably managed. (R. at 18.) Dr. Geckle's opinion that Plaintiff was limited to part-time work also did not appear to be based on any objective findings. (R. at 18.)

At step four, the ALJ found that Plaintiff could not perform the requirements for any of her past relevant work. (R. at 19.) Next, considering her age, education, work experience and RFC, the ALJ found that jobs existed in significant numbers in the national economy that Plaintiff could perform. (R. at 20.) The ALJ therefore determined that Plaintiff had not been under a disability under the Act from July 23, 2007. (R. at 20.)

Plaintiff argues that the ALJ erred in assessing her credibility. (Pl.'s Mem. at 18.) Next, Plaintiff complains that the ALJ did not assign controlling weight to the opinions of her treating neurosurgeon, Dr. Geckle. (Pl.'s Mem. at 25-26.) The Commissioner argues that the ALJ's credibility assessment and decision to assign little weight to Dr. Geckle's opinions are supported by substantial evidence in the record. (*See* Def.'s Mot. for Summ. J. and Mem. in Supp. ("Def.'s Mem.") at 1.)

A.    **Substantial evidence supported the ALJ's evaluation of Plaintiff's credibility.**

After step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 416.920(e)-(f), 416.945(a)(1). The RFC must incorporate impairments supported by

the objective medical evidence in the record and those impairments that are based on the claimant's credible complaints.

Plaintiff argues that the ALJ's credibility determination applied an incorrect standard and was not supported by substantial evidence. (Pl.'s Mem. at 8.) The Commissioner disagrees, asserting that the ALJ's credibility determination was thoroughly explained and supported by substantial evidence. (Def.'s Mem. at 11.) The ALJ found that the objective medical evidence did not explain the degree of pain that Plaintiff alleged. (R. at 15.) She also determined that Plaintiff's ADLs, inconsistent statements and narcotic use diminished Plaintiff's credibility. (R. at 15-16.)

In evaluating the credibility of a claimant's subjective symptoms, the ALJ must follow a two-step analysis. *Craig v. Charter*, 76 F.3d 585, 594 (4th Cir. 1996); *see also* SSR 96-7p; 20 C.F.R. §§ 404.1529(a) and 416.929(a). The first step is to determine whether there is an underlying medically determinable physical or mental impairment or impairments that reasonably could produce the individual's pain or other related symptoms. *Craig*, 76 F.3d at 594; SSR 96-7p, at 1-3. The ALJ must consider all of the medical evidence in the record. *Craig*, 76 F.3d at 594-95; SSR 96-7p, at 5, n.3; *see also* SSR 96-8p, at 13 (specifically stating that the "RFC assessment must be based on *all* of the relevant evidence in the case record" (emphasis added)). If the underlying impairment reasonably could be expected to produce the individual's pain, then the second part of the analysis requires the ALJ to evaluate a claimant's statements about the intensity and persistence of the pain and the extent to which it affects the individual's ability to work. *Craig*, 76 F.3d at 595. The ALJ's evaluation must take into account "all the available evidence," including a credibility finding of the claimant's statements regarding the

extent of the symptoms and the ALJ must provide specific reasons for the weight given to the individual's statements. *Id.* at 595-96; SSR 96-7p, at 5-6, 11.

Although Plaintiff contends that the ALJ did not explain how the medical evidence did not support Plaintiff's subjective allegations of pain and failed to point to specific evidence, the ALJ noted that since Plaintiff's MRI in 2007, "physical examinations consistently showed a normal and steady gait, essentially normal neurological findings with no signs of deterioration and no decrease in muscle strength. Further, a straight leg-raising test was negative and [Plaintiff had] not had any bowel or bladder issues (Exhibit 4F)." (R. at 17.) These findings, the ALJ concluded, detracted from Plaintiff's credibility as to the intensity, duration and effects of her back injury. (R. at 17.) Plaintiff's neurological exams in the medical record were normal; she had 5/5 muscle strength, normal muscle tone and bulk and typically had a normal and steady gait, although on two occasions her gait was slightly antalgic. (R. at 260-61, 283, 311, 350-62, 647, 663, 680, 701-18.) According to treatment notes, Plaintiff's pain was usually reasonably managed. (R. at 253-54, 357, 398, 600, 647, 680, 698.) The ALJ properly characterized the medical evidence in the record and appropriately took this evidence into account when assessing her credibility.

Plaintiff next complains that the ALJ mischaracterized her ADLs or, if correctly characterized, these ADLs did not provide substantial evidence of her ability to perform light work, defined by Plaintiff as "work on her feet the majority of the day lifting ten pounds for 2/3 of the day and twenty pounds for 1/3 of the day." (Pl.'s Mem. at 13.) Plaintiff's definition is directly in conflict with the ALJ's RFC, which limited her to jobs that allowed her a sit/stand option at will. (R. at 14.) Plaintiff testified at the hearing that she cooked dinner twice per week. (R. at 51.) She would make "[r]oast or something simple" that could "fit in, like, a crockpot . . . .

[I]f it [was] a better day, [her husband would] come in and get the pans and stuff" so she could make a meal. (R. at 51.) Plaintiff testified that she drove twice during the week of the hearing. (R. at 53.) When the ALJ asked her about an average week, Plaintiff testified that the week of the hearing "probably [was] an average week." (R. at 53.) Plaintiff testified that she made several trips that summer to a lake, went grocery shopping about once every week, visited with friends or family on a weekly basis and went to the mall with her daughter several times that summer. (R. at 54, 57-59.)

These activities are consistent with Plaintiff's Function Report from April 21, 2009, and her Daily Activities Questionnaire dated January 31, 2010. (*See* R. at 198-205; 224-28.) In the Function Report, Plaintiff indicated that she cooked about once a week, went grocery shopping with her husband once or twice a week and went out a "couple times" each week. (R. at 200-202.) In her Daily Activities Questionnaire, Plaintiff wrote that she went grocery shopping with her family and shopping with her friends. (R. at 224.) She would visit with family or friends a few times each week and cooked dinner a few nights per week. (R. at 225-26.) Thus, the ALJ's determination that these ADLs appeared "inconsistent with the frequency, debilitating degree of pain, and significant limitations" that Plaintiff testified to and, as such, detracted from her credibility, (R. at 15), is supported by significant evidence in the record. The ALJ did not greatly mischaracterize Plaintiff's own statements and testimony pertaining to her ADLs and appropriately took Plaintiff's ADLs into account when assessing her credibility.

Plaintiff next argues that the ALJ mischaracterized her statements about the side effects of her medication and her testimony about good and bad days as inconsistent statements. (Pl.'s Mem. at 17-19.) Plaintiff claims that her testimony before the ALJ was not inconsistent with her prior statements about side effects, because the side effects may have changed from the time she

filled out the form. (Pl.'s Mem. at 17.) On November 21, 2008, Plaintiff indicated on a Disability Report that she was not experiencing any side effects from her medications — Cymbalta and Oxycodone. (R. at 182.) In her Appeal Disability Report from August 8, 2009, however, Plaintiff listed a number of side effects from her medications, including nausea, occasional blurred vision, constipation, vomiting, dry mouth and fatigue. (R. at 209.) She did not report any lasting side effects to Dr. Crane during visits around that time, although she did report some initial nausea from the Neurontin. (R. at 701-18.) Plaintiff testified before the ALJ on August 11, 2010, that she "may have headaches. A little nausea at times [and felt] like [her] focusing, it really [affected] that, too." (R. at 48.) The ALJ also cited Plaintiff's testimony about good and bad days as a factor detracting from her credibility. (R. at 15.) Plaintiff initially testified that in an average week, she would have two good days and two or three bad days. (R. at 60.) When questioned by her counsel, Plaintiff answered that she would have three good days and four bad days. (R. at 61.) Plaintiff later added two "in-between" days, bringing the total to nine days in a week. (R. at 66.) Plaintiff finally testified that she had three bad days, two in-between days, and two good days, for a total of seven days in a week. (R. at 66.) The ALJ did not mischaracterize Plaintiff's testimony or prior statements and could consider these inconsistent statements when determining her credibility.

Finally, Plaintiff objects to the ALJ's characterization of her use of narcotic pain medications. (Pl.'s Mem. at 19-24.) Plaintiff argues that the ALJ's reference to "in general" indicates that the ALJ did not consider the facts of this case in making her credibility determination. (Pl.'s Mem. at 20.) Plaintiff further asserts that the ALJ's determination that Plaintiff's use of narcotic pain medication detracted from her credibility was not supported by substantial evidence. (Pl.'s Mem. at 20-24.)

The ALJ noted that Plaintiff's pattern of use of narcotic medication combined with the lack of objective medical findings and the treatments notes in the medical record diminished her credibility as to the intensity and frequency of her pain. (R. at 15-16.) In September 2007, Dr. Mayfield lowered the dosage of Plaintiff's Percocet. (R. at 413.) Plaintiff argued with the pharmacist over the dosage, but ultimately took the lower dose. (R. at 413.) At her next appointment, Dr. Mayfield noted that Plaintiff was not tolerating the lower dosage and increased it. (R. at 241.) A year later, Dr. Mayfield again lowered Plaintiff's medication dosages. (R. at 604.) He lowered the dosage on her Percocet and Duragesic, intending to discontinue its use. (R. at 604.) When Dr. Irby examined Plaintiff two months later, he noted that the examination was "unremarkable for any objective findings" and opined that pain medication was unnecessary. (R. at 260-62.) When Plaintiff returned to Dr. Mayfield three days later, however, she told him that Dr. Irby had questioned her about only taking Oxycontin. (R. at 603.)

Plaintiff returned to Dr. Crane for the first time in six months in December 2008, three months after Dr. Mayfield had started to wean her off her pain medications. (R. at 676-77.) Plaintiff told him that Dr. Mayfield was attempting to lower her dosages of pain medications, but she had not tolerated it well. (R. at 676.) At that point, Dr. Crane took over managing Plaintiff's pain medications. (R. at 677.) Regardless, she returned to Dr. Mayfield twice to seek medications for her back pain. (R. at 600, 685.) Although the ALJ mischaracterized one of the records to indicate Plaintiff was "exaggerating" her symptoms, she did not mischaracterize the records concerning Plaintiff's medication use and could consider this pattern in assessing Plaintiff's credibility.

This Court must give great deference to the ALJ's credibility determinations. *See Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997). The Fourth Circuit has determined

that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" *Id.* (quoting *NLRB v. Air Prods. & Chems., Inc.*, 717 F.2d 141, 145 (4th Cir. 1983)). Therefore, this Court must accept the ALJ's factual findings and credibility determinations unless "'a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all.'" *Id.* (quoting *NLRB v. McCullough Envtl. Servs., Inc.*, 5 F.3d 923, 928 (5th Cir. 1993)).

Furthermore, it is well established that Plaintiff's subjective allegations of pain are not, alone, conclusive evidence that Plaintiff is disabled. *See Mickles v. Shalala*, 29 F.3d 918, 919 (4th Cir. 1994). The Fourth Circuit has determined that "subjective claims of pain must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Craig*, 76 F.3d at 591. Because substantial evidence supported her decision, the ALJ did not err in evaluating Plaintiff's credibility.

**B.     Substantial evidence supported the ALJ's assignment of weight to the medical opinions.**

During the sequential analysis, when the ALJ determines whether the claimant has a medically-determinable severe impairment, or combination of impairments which would significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ must analyze the claimant's medical records that are provided and any medical evidence resulting from consultative examinations or medical expert evaluation that have been ordered. *See* 20 C.F.R. § 416.912(f). When the record contains a number of different medical opinions, including those from Plaintiff's treating physicians, consultative examiners or other sources that are consistent with each other, then the ALJ makes a determination based on that evidence. *See* 20 C.F.R. § 416.927(c)(2). If, however, the medical opinions are inconsistent internally with

each other, or other evidence, the ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence involved. 20 C.F.R. § 416.927(c)(2), (d).

Under the applicable regulations and case law, a treating physician's opinion must be given controlling weight if: (1) it is well-supported by medically-acceptable clinical and laboratory diagnostic techniques and (2) is not inconsistent with other substantial evidence in the record. *Craig*, 76 F.3d at 590; 20 C.F.R. § 416.927(d)(2); SSR 96-2p. However, the regulations do not require that the ALJ accept opinions from a treating physician in every situation, *e.g.*, when the physician opines on the issue of whether the claimant is disabled for purposes of employment (an issue reserved for the Commissioner), when the physician's opinion is inconsistent with other evidence or when it is not otherwise well supported. *Jarrells v. Barnhart*, No. 7:04-CV-00411, 2005 WL 1000255, at *4 (W.D. Va. Apr. 26, 2005); *see also* 20 C.F.R. §§ 404.1527(d)(3)-(4), (e).

Plaintiff argues that Dr. Geckle's opinions were supported by objective medical evidence and were consistent with his treatment notes and, as such, should have been given controlling weight. (Pl.'s Mem. at 25-29.) Plaintiff's claim is unsupported by the substantial evidence in the record that indicated that Plaintiff's neurological exams were normal — she had 5/5 muscle strength, normal muscle tone and bulk, and typically had a normal and steady gait, although on two occasions her gait was slightly antalgic — and that her pain was reasonably managed. (R. at 156, 260-61, 283, 600, 602, 647-55, 663, 680, 701-18.) Dr. Geckle's own treatment notes documented that Plaintiff's physical and neurological exams were typically normal and her pain was well managed. (R. at 259, 648, 653, 693, 694, 698.) Plaintiff had good strength, normal muscle tone and bulk and a normal and steady gait. (R. at 647-55.)

As the ALJ noted, Dr. Geckle's increasingly restrictive opinions were contradicted by his own treatments notes. (R. at 18.) In August 2008, Dr. Geckle endorsed the FCE and opined that the restrictions were acceptable. (R. at 633.) He modified that opinion in February 2009, restricting Plaintiff to light work three days a week, four hours per day. (R. at 350.) Dr. Geckle saw Plaintiff once between those two opinions — on November 19, 2008 — and, as the ALJ noted, he had not performed any follow-up testing since the original MRI from August 2007. (R. at 648, 650.) He noted at the November 19, 2008 appointment that Plaintiff's pain was "no worse than what it was before," and that she had no bowel or bladder issues. (R. at 648.) Plaintiff's neurological exam showed good strength, normal muscle tone and bulk, symmetric deep tendon reflexes and a normal and steady gait. (R. at 648.) Plaintiff was "stable, neurologically, with no signs of deterioration" and her pain management was reasonable. (R. at 648.) Dr. Geckle also again noted his agreement with the restrictions from the FCE. (R. at 648.) At her March 2009 appointment, one month after the opinion, Dr. Geckle noted that Plaintiff was "stable without evidence of deterioration" and her neurological exam was normal, except that her gait was "mildly antalgic." (R. at 647.) Despite these inconsistencies and a lack of substantial evidence in the record to assign controlling weight to Dr. Geckle's opinions, the ALJ did assess limitations in Plaintiff's RFC of light work based on her pain, restricting her to work that allowed her to sit or stand at will, required only occasional turning of the head from side to side and required only simple, repetitive tasks. (R. at 14.)

While the ALJ must generally give more weight to a treating physician's opinion, "circuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig*, 76 F.3d at 590 (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)). Since its decision in *Hunter*, the Fourth Circuit has consistently held that, "[b]y negative implication, if a

physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight."[6] *Mastro*, 270 F.3d at 178 (citing *Craig*, 76 F.3d at 590); *see also* 20 C.F.R. § 416.927(d)(2). Because Dr. Geckle's opinions were inconsistent with substantial evidence — including his own treatment notes — the ALJ did not err in assigning less than controlling weight to the opinions of Plaintiff's treating neurosurgeon.

## VI. CONCLUSION

Based on the foregoing analysis, it is the recommendation of this Court that Plaintiff's motion for summary judgment (ECF No. 8) be DENIED; that Defendant's motion for summary judgment (ECF No. 12) be GRANTED; and, that the final decision of the Commissioner be AFFIRMED.

Let the Clerk forward a copy of this Report and Recommendation to the Honorable John A. Gibney, Jr., and to all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a *de novo* review of the determinations contained in the report and such failure**

---

[6] If a medical opinion is not assigned controlling weight by the ALJ, then the ALJ assesses the weight of the opinion by considering: (1) the length of the treatment relationship and the frequency of examinations; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area in which an opinion is rendered; and (6) other factors brought to the Commissioner's attention which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d)(2)-(6); *Hines v. Barnhart*, 453 F.3d 559, 563 (4th Cir. 2006).

shall bar you from attacking on appeal the findings and conclusions accepted and adopted

by the District Judge except upon grounds of plain error.

_____ /s/

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date:  October 24, 2012